IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 30400-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JAMISON WAYNE LANG, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Jamison Lang challenges the sufficiency of the evidence to support his conviction of possession of a stolen vehicle. The evidence was sufficient. He raises over a dozen issues in a statement of additional grounds but only one has merit: the trial court lacked authority to impose 36 months' community custody. We affirm the conviction but remand to the trial court to correct the community custody provision.

FACTS AND PROCEDURAL BACKGROUND

Late in the morning on September 5, 2010—the Sunday of Labor Day weekend— residents of an apartment complex noticed Jamison Lang sleeping in a car that had been parked in one of the resident's spots. The engine was running and the windows were rolled down. One resident approached Mr. Lang to ask him if he lived at the complex

and noticed that he smelled of alcohol and had a black knife lying across his lap. When he only mumbled in response, she told him that if he was not a resident his car was going to be towed. The manager was notified of Mr. Lang's presence and called police.

Officer Zachary Dahle of the Spokane Police Department responded to the call and arrived at the complex just as Mr. Lang was stepping out of the driver's side door. Mr. Lang initially did not respond to the officer's question about who owned the car but denied having a knife. Officer Dahle still frisked Mr. Lang for officer safety purposes. Suspicious about Mr. Lang's presence in the car the officer handcuffed him, deciding to detain him while checking to see if the car had been reported stolen.

A license plate check on the car revealed that the car was registered to Catherine Brady and had not been reported stolen. The address to which the car was registered was only 55 blocks away; though, so Officer Jeffrey McCollough, who had arrived at the complex after Officer Dahle, drove to the address in hopes of determining whether Mr. Lang had Ms. Brady's permission to be in the car. No one was at the home. Officer McCollough saw clear signs of a burglary, however, and reported that to Officer Dahle, who then placed Mr. Lang under arrest. Department employees later reached Ms. Brady, who confirmed that she had left town with her car parked and locked in front of the home and had not given anyone permission to use it.

2

Upon arresting Mr. Lang, Officer Dahle advised him of his *Miranda*[1] rights and Mr. Lang agreed to speak with the officer. In response to questioning, he first said that he was in the car because he had been wandering through the parking lot and got in it to sleep. A bit later, he told the officer a friend gave him permission to sleep in the car. He would not identify the friend.

Officer Dahle collected several items from the car, including a key ring in the ignition that included a shaved key, cigarettes, a pair of needle nose pliers, zigzag rolling papers, and a black knife. Ms. Brady later identified the knife, pliers, and car keys (although not the shaved key) as items stolen from her home sometime over the Labor Day weekend. After the car was returned to Ms. Brady, she found two receipts in the car with Mr. Lang's name on them, both dated September 2, the Thursday before his arrest. She turned them over to police.

Mr. Lang was charged with one count of residential burglary and one count of possession of a stolen vehicle.

At trial, Ms. Brady testified that she left home at about 3 p.m. on Friday, September 3, to go camping. She left her locked car in the driveway and its keys in her locked home. She testified that she had been able to inventory 75 items missing from the home on her return, including valuable electronics and jewelry. She also testified that her

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

3

car had been damaged so badly between the time it was taken from her home and the time it was recovered at the apartment complex that her insurance company treated it as totaled for insurance purposes.

Mr. Lang did not testify. His lawyer argued to the jury that while his client had been found sleeping in a stolen car, no one had seen who drove it to the complex and parked it there, and the arrest of Mr. Lang for residential burglary and knowingly possessing stolen property "require[s] a huge leap in logic." Report of Proceedings (RP) (Aug. 18, 2011) at 181. She stressed the facts that almost none of the property stolen from Ms. Brady's home was found in the car or on Mr. Lang, there was no forensic evidence he had ever been in the Brady home, and "[a]s far as the car goes, it's logical Mr. Lang could have been drunk and crawled in to go to sleep." *Id.* at 183.

The jury acquitted Mr. Lang of the residential burglary charge but found him guilty of possession of a stolen vehicle. He appeals.

## ANALYSIS

Mr. Lang challenges the sufficiency of the evidence to support his conviction of possession of a stolen vehicle. To prove that Mr. Lang possessed a stolen vehicle, the State had to prove, among other things, that he possessed the vehicle *knowing* it was stolen. RCW 9A.56.140(1). A person is deemed to have acted knowingly with respect to a fact when he is aware of the fact or when he has information that would lead a reasonable person in the same situation to believe the fact exists. RCW 9A.08.010(1)(b).

4

In reviewing a claim of insufficient evidence, we view evidence in the light most favorable to the State in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Brockob*, 159 Wn.2d 311, 336, 150 P.3d 59 (2006). An insufficient evidence claim admits the truth of the evidence as well as all reasonable inferences that can be drawn from the evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). A conviction will be reversed only when no rational trier of fact could have found that the State proved all of the elements of the crime beyond a reasonable doubt. *State v. Smith*, 155 Wn.2d 496, 501, 120 P.3d 559 (2005).

The "mere possession of stolen property does not create a presumption that the possession is larcenous"; nonetheless, possession is "a relevant circumstance to be considered with other evidence tending to prove the elements of the crime." *State v. Hatch*, 4 Wn. App. 691, 694, 483 P.2d 864 (1971). Once one is in possession of stolen property, only "'slight corroborative evidence of other inculpatory circumstances tending to show . . . guilt [is needed to] support a conviction.'" *Id.* (quoting 4 CLARK A. NICHOLS, APPLIED EVIDENCE *Possession of Stolen Property* § 29, at 3664 (1928)); *see State v. Clark*, 143 Wn.2d 731, 765, 24 P.3d 100 (2001) ("False information given to the police is considered admissible as evidence relevant to defendant's consciousness of guilt."); *State v. Mace*, 97 Wn.2d 840, 844-45, 650 P.2d 217 (1982) (while mere

possession of recently stolen property will not support a burglary conviction, inference of guilt is strong where defendant gave improbable or inconsistent explanation for possession). Possession of recently stolen property coupled with a dubious account of its acquisition are sufficient facts to support conviction. *Hatch*, 4 Wn. App. at 694.

Here, the prosecution offered the shaved key and Mr. Lang's conflicting accounts of how he came to be sleeping in the vehicle. He was found in the car within 48 hours of when it had to have been stolen. The two receipts belonging to Mr. Lang that were found in the car rather than on his person suggested he was in the car longer, and moving around more, than someone who just crawled in to go to sleep—as did the fact that he had found the stolen knife and placed it in his lap. Coupled with his presence in the stolen vehicle, the State's evidence was sufficient corroborative evidence of other inculpatory circumstances to support the conviction.

## STATEMENT OF ADDITIONAL GROUNDS

In his pro se statement of additional grounds (SAG), Mr. Lang raises over a dozen issues that he places in four categories, denominated by him as (1) ineffective assistance of counsel, (2) illegal seizure, (3) prosecutorial misconduct, and (4) judicial abuse of discretion.

### Ineffective Assistance of Counsel

Mr. Lang claims ineffective assistance of counsel for his lawyer's failure to object on several occasions and his failure to file motions requested by Mr. Lang. To prevail on

a claim of ineffective assistance of counsel, Mr. Lang must show both that (1) counsel's performance was deficient and (2) the deficient performance prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). There is a presumption that counsel was effective. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Trial strategy and tactics cannot form the basis of a finding for deficient performance. *State v. Hendrickson*, 129 Wn.2d 61, 77-78, 917 P.2d 563 (1996). Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. *Id.* at 78.

Mr. Lang complains for the first time on appeal that his lawyer failed to object to the officers' removal of keys from the car, citing *Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009). But Mr. Lang had no substantial proprietary or possessory interest in the car or in the keys and has no standing to object to the officers' removing them. *State v. Foulkes*, 63 Wn. App. 643, 821 P.2d 77 (1991). He had stepped out of the car and cannot claim automatic standing at the time of the search; he therefore had no legitimate expectation of privacy to assert. *State v. Zakel*, 119 Wn.2d 563, 834 P.2d 1046 (1992).

He complains that his lawyer failed to object when the prosecutor showed photographs to jurors before they were admitted into evidence. He has not demonstrated deficient performance. Even though the State had not established the entire chain of custody required to admit the photographs, Mr. Lang's lawyer knew that another officer

7

would be called. The decision not to object to evidence that the lawyer reasonably knew would eventually be admitted was tactical. Mr. Lang fails to demonstrate prejudice for that reason and for a second reason: the trial court cautioned jurors immediately after they were shown the photographs that they should not be considered unless and until they were admitted, which they later were.

He contends that his lawyer failed to object to testimony by Officer Dahle that was "deemed to be false in the 3.5 hearing." SAG at 4. The only determination made in the CrR 3.5 hearing was that one question by Officer Dahle and response by Mr. Lang would be excluded because Mr. Lang's statement was made while in custody and before he was read his *Miranda* rights. The excluded question was the officer's asking who the car belonged to, to which Mr. Lang responded, "'I don't know.'" RP (Aug. 16, 2011) at 25. The State did not elicit testimony about this exchange at trial.

Mr. Lang provides no evidence or argument in support of his contention that his lawyer "ignored his multiple requests on the filing of multiple motions." SAG at 5. In addition to that assignment being insufficiently articulated, we have no factual foundation in the record from which we could even begin to address it. It must be more specifically set forth and considered, if at all, in a personal restraint petition. *McFarland*, 127 Wn.2d at 338.

8

Illegal Seizure

Mr. Lang argues that he was detained for "close to an hour" by Officer Dahle before Officer McCollough determined that a burglary had occurred at the Brady residence on the basis of which Officer Dahle placed him under arrest. SAG at 6. The evidence he cites—the testimony of Officer McCollough—suggests that it *might* have taken that long but it also might have taken as little as half an hour. In any event, Mr. Lang argues that the detention was excessive and therefore unlawful.

An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *State v. Wheeler*, 43 Wn. App. 191, 195-96, 716 P.2d 902 (1986) (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)), *aff'd*, 108 Wn.2d 230, 737 P.2d 1005 (1987); *State v. Williams*, 102 Wn.2d 733, 741, 689 P.2d 1065 (1984) (recognizing that a 35-minute detention of the defendant to investigate a burglary "approach[ed] excessiveness"); *cf. State v. Cunningham*, 116 Wn. App. 219, 229, 65 P.3d 325 (2003) (upholding a 45-minute *Terry*[2] stop where the defendant was uncooperative and officers had reasonable suspicion he had committed vehicle theft).

Even if Mr. Lang had demonstrated a near-one-hour detention that we were willing to consider for the first time on appeal, Mr. Lang does not explain how the

---

[2] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

9

detention contributed to any error during the trial. The trial court suppressed the only statement that Mr. Lang made during the period of detention, accepting his lawyer's argument that he was in custody and had not been read his *Miranda* rights. There was no other evidence that was the result of the detention. "An illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, or as a defense to a valid conviction." *United States v. Crews*, 445 U.S. 463, 474, 100 S. Ct. 1244, 63 L. Ed. 2d 537 (1980). An excessive detention is likewise not a bar to prosecution nor a defense to conviction.

## Prosecutorial Misconduct

Mr. Lang asserts that the prosecutor engaged in prosecutorial misconduct during trial and in the sentencing hearing. A defendant claiming prosecutorial misconduct bears the burden of proving that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial. *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008). Prosecutorial misconduct is grounds for reversible error only if there is a substantial likelihood that the misconduct affected the verdict. *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994). If there is no proper objection at trial, then the error is not reversible unless the misconduct was so flagrant and ill intentioned that no curative instruction could have prevented the resulting prejudice. *State v. Corbett*, 158 Wn. App. 576, 594, 242 P.3d 52 (2010) (citing *Russell*, 125 Wn.2d at 86).

10

Mr. Lang first argues that the prosecutor disobeyed the trial court's order excluding the one question and answer that occurred during the period he was detained. The parties and the court were clear in the CrR 3.5 hearing to distinguish six statements made by Mr. Lang. Only one—identified by the prosecutor as statement number three— was excluded. That was when Officer Dahle asked during the period of detention whose vehicle it was, in response to which Mr. Lang said, "'I don't know.'" RP (Aug. 16, 2011) at 25. Referring to that exchange, the trial court ruled "you cannot testify about asking whose vehicle it was and him saying 'I don't know.'" *Id.* at 29.

If there is confusion, the source is because the very first exchange between Officer Dahle and Mr. Lang was only partially addressed in the CrR 3.5 hearing but was fleshed out at trial. The officer's testimony at the CrR 3.5 hearing was that upon arrival at the apartment complex, "I contacted him and he said this [is] harassment." *Id.* at 13. Neither the State nor Mr. Lang's lawyer asked the officer what exactly he said in his "contact" that prompted Mr. Lang to respond, "this [is] harassment." Evidently the prosecutor knew, because in arguing the suppression motion, he stated, "Officer Dahle asked Lang if that was his vehicle. Lang replied 'this is harassment.'" *Id.* at 24. The court, not recalling this in Officer Dahle's testimony, cautioned the lawyers to keep the statements straight. *Id.*

At trial, the prosecutor asked for more detail about the first contact, eliciting the following testimony from Officer Dahle:

11

Q.     . . . [D]id you contact Mr. Lang?
A.     I did.
Q.     Did you ask Mr. Lang a question?
A.     I did.
Q.     What was the first question you asked him?
A.     I asked if it was his vehicle.
Q.     And what was Mr. Lang's response?
A.     "This is harassment."

RP (Aug. 17, 2011) at 99.

The trial court's suppression ruling was clear: she excluded only the question posed and answer given during the period of detention. The testimony that Mr. Lang now challenges related to the first contact, which the trial court explicitly ruled was admissible. While the CrR 3.5 hearing did not reveal what Officer Dahle's first question had been, it was not improper for the prosecutor to present evidence of that question and response at trial or to discuss that testimony in closing argument.

Mr. Lang next argues that the prosecutor attempted to prejudice Mr. Lang by falsely presenting that he was serving community custody at the time of his possession of Ms. Brady's stolen car. He attaches a judgment and sentence in a case involving a different crime committed on August 5, 2010, in which the criminal history is marked "not applicable" as to whether Mr. Lang was on community custody when he committed that crime. SAG at 15. The judgment and sentence is not itself evidence that Mr. Lang was not serving community custody when he possessed Ms. Brady's car. Other materials in the record state that Mr. Lang was on felony probation at the time. *See* Clerk's Papers

12

at 24. In addition, Mr. Lang's offender score applied in sentencing for this crime was 9+; his lawyer conceded that at the time of sentencing, his offender score was 11. He has not demonstrated misconduct or prejudice.

Mr. Lang also argues that the prosecutor lied to the court at the sentencing hearing in representing that Renee Cooper was his probation officer. Ms. Cooper was present in court, though; told the court herself that she was Mr. Lang's probation officer; and answered questions from the court. There was no misconduct.

Finally, Mr. Lang asserts that the prosecutor acted improperly when he focused on the shaved key, creating "a false impression of a material fact." SAG at 9. Nothing in the record indicates that the prosecutor used the evidence of the shaved key improperly.

### Abuse of Discretion

Mr. Lang raises six claims of "abuse of discretion," which amount to complaints about judicial rulings, statements, or asserted inaction. In most cases, he does not cite to the record and in no case does he identify the legal basis for assigning error. "Abuse of discretion" is not the standard of review for most of the matters complained of in this section of Mr. Lang's SAG. While reference to the record and citation to authorities are not necessary or required, we will not consider a statement of additional grounds for review if it does not inform us of the nature and occurrence of alleged errors. RAP 10.10(c). We refuse to consider most of the assignments for this reason.

13

We choose to address two: Mr. Lang's complaint that the trial court imposed a timeline for trial during jury selection and its imposition of a 36-month term of community custody.

First, Mr. Lang asserts that "[d]uring the jury selection process in front of the whole panel of proposed jurors, [the trial judge] gave the whole panel and the prosecution and Mr. Lang's trial counsel an order that this trial was absolutely not to exceed [sic] into Friday because that would cause an inconvenience to [the judge's] upcoming vacation." SAG at 10. He makes a related complaint that his appellate lawyer failed to obtain a transcript of the voir dire so that he could support this allegation.

The trial commenced on Tuesday, August 16, 2011. Given the number of witnesses that had been identified, there was every reason for the trial court to conclude that trial could easily be concluded on Thursday, and it was. In fact, the report of proceedings reveals that the jurors were excused early on both Tuesday and on Wednesday (when the presentation of evidence was completed) and were not required to return until 10 a.m. on Thursday, when the jury instructions were completed and the lawyers were ready to deliver closing arguments. The case was submitted to the jurors by the lunch hour. There is absolutely no indication that the time for trial identified by the court was unfair or that Mr. Lang was prejudiced in any way.

A trial judge enjoys "the broad discretionary right . . . to control the trial of the case." *State v. Stiltner*, 61 Wn.2d 102, 105, 377 P.2d 252 (1962). The rules of evidence

14

contemplate that a principal responsibility of the trial judge is to conduct an efficient trial, eliminating unjustifiable expense and delay by, among other things, limiting the parties to relevant, noncumulative evidence. ER 102, 402, 403. For the trial court to announce what it believes to be realistic parameters on the time required for trial is not only legitimate for the court's control over its own schedule, but is helpful to the lawyers and jurors. Due process would be a concern if the time projection was unrealistic or proved to be truly inflexible and prejudicial. But none of those concerns are raised here. The statement, even if accurately recounted by Mr. Lang, was not an abuse of discretion. A transcript of the voir dire proceeding is therefore unnecessary.

The second assignment we consider is Mr. Lang's contention that the trial court "knowingly sentenced [him] to a sentence outside the standard range, by ordering 36 months of community custody" at the same time knowing "that no community custody was to be allowed." SAG at 11. The court's authority to impose community custody has been modified periodically by the legislature. The current versions of RCW 9.94A.701 and .702, which applied to Mr. Lang's sentencing, do not contemplate community custody sentencing for possession of a stolen vehicle. The State has not provided any other authority or argument to support the community custody sentence. Indeed, the prosecutor stated, when asked at sentencing about the amount of community custody associated with Mr. Lang's conviction, that "[t]here is none." RP (Oct. 18, 2011) at 208. While the trial court cogently explained its interest in Mr. Lang's being supervised by the

15

Department of Corrections following his release from incarceration, the legislature has not authorized postrelease supervision for this crime.

We affirm Mr. Lang's conviction and remand for correction of the community custody portion of his sentence.

A majority of the panel has determined that this opinion will not be printed in the Washington Appellate Reports but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, C.J.

_____
Sweeney, J.

16